IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Southeastern Pennsylvania    :
Transportation Authority,    :
            Appellant    :
    :
        v.    :   No. 2445 C.D. 2009
    :   Argued: February 11, 2015
City of Philadelphia and    :
Philadelphia Commission on    :
Human Relations    :


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ROBERT SIMPSON, Judge
                HONORABLE MARY HANNAH LEAVITT, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE ANNE E. COVEY, Judge

OPINION
BY JUDGE LEAVITT                           FILED: August 7, 2015

        The Southeastern Pennsylvania Transportation Authority (SEPTA) seeks a declaratory judgment that as a Commonwealth agency it is not subject to the City of Philadelphia's anti-discrimination ordinance, but only to the provisions of the Pennsylvania Human Relations Act.[1] The defendants, the City and the Philadelphia Commission on Human Relations (Philadelphia Commission), demurred to the complaint, and the Court of Common Pleas of Philadelphia County (trial court) sustained their preliminary objections. This Court reversed. The Supreme Court vacated our order and remanded the matter to this Court to do

---

[1] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§951-963.

additional analysis. Concluding that the legislature did not intend SEPTA to be subject to a local anti-discrimination ordinance, we reverse.

## Background

In 1963, the General Assembly established SEPTA pursuant to the Metropolitan Transportation Authorities Act, 74 Pa. C.S. §§1701-1785.[2] That Act provides:

> There is hereby authorized the creation of a separate body corporate and politic in each metropolitan area, to be known as the transportation authority of that metropolitan area, extending to and including all of the territory in the metropolitan area.

74 Pa. C.S. §1711(a). A "metropolitan area" is defined as "[a]ll of the territory within the boundaries of any county of the first class and all other counties located in whole or in part within 20 miles of the first class county." 74 Pa. C.S. §1701. Philadelphia is a "county of the first class." Consistent with Section 1701, SEPTA operates a mass-transit system in Philadelphia and the four contiguous counties of Bucks, Chester, Delaware and Montgomery. As a transportation authority, SEPTA exercises the powers of a Commonwealth agency. Section 1711(a) further states:

> An authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, *but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.*

74 Pa. C.S. §1711(a) (emphasis added).

---

[2] The original Metropolitan Transportation Authorities Act of 1963, Act of August 14, 1963, P.L. 984, No. 450, has been replaced by the current Metropolitan Transportation Authorities Act, 74 Pa. C.S. §§1701-1785. All transportation authorities are deemed to have been created under the current act. 74 Pa. C.S. §1711(c)(1).

Philadelphia is a first class city that is governed under authority of the First Class City Home Rule Act.[3]  Consistent with that authority, the City has established the Philadelphia Commission to administer and enforce the Philadelphia Fair Practices Ordinance,[4] which prohibits discrimination in the areas of employment, housing and public accommodations.  The Fair Practices Ordinance forbids discrimination on the basis of race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status.  PHILA. CODE §§9-1103, 9-1106.[5]

In 1955, the General Assembly enacted the Pennsylvania Human Relations Act, which forbids discrimination in the areas of employment, housing

---

[3] Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§13101-13157.

[4] The Fair Practices Ordinance is codified at Sections 9-1101 through 9-1129 of The Philadelphia Code.

[5] Sections 1103 and 1106 of the Fair Practices Ordinance state, in relevant part, as follows:

§9-1103 Unlawful Employment Practices.

(1)  It shall be an unlawful employment practice to deny or interfere with the employment opportunities of an individual based upon his or her race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status.

PHILA. CODE §9-1103.

§9-1106 Unlawful Public Accommodations Practices.

(1)  It shall be an unlawful public accommodations practice to deny or interfere with the public accommodations opportunities of an individual or otherwise discriminate based on his or her race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, disability, marital status, familial status, or domestic or sexual violence victim status.

PHILA. CODE §9-1106.

and public accommodations on the basis of "race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability, [or] use of guide or support animals because of the blindness, deafness or physical handicap of the user…." Section 2 of the Human Relations Act, 43 P.S. §952. Its reach is statewide.

Both the Human Relations Act and the Fair Practices Ordinance forbid invidious discrimination. The protected classes in each legislation are nearly identical, but there are differences. The Fair Practices Ordinance forbids discrimination on the basis of a person's sexual orientation and gender identity, genetic information or domestic violence status, and the Human Relations Act does not. On the other hand, the Human Relations Act protects those who use support animals by reason of their deafness and blindness; the Fair Practices Ordinance does not.

**Facts and Procedural History**

Between July 2007 and April 2009, the Philadelphia Commission initiated seven separate complaints and investigations against SEPTA for alleged discrimination against its employees or customers in violation of the Fair Practices Ordinance. Complaint, ¶14; Reproduced Record at 95a-96a (R.R. ___).[6] Two of the complaints involved alleged discrimination on the basis of gender identity and

---

[6] Three complaints alleged discrimination on the basis of disability, one alleged religious discrimination, one alleged gender discrimination, one alleged sexual orientation discrimination and one alleged gender identity discrimination. Complaint, ¶14; R.R. 95a-96a. All but two complaints involve alleged conduct expressly prohibited by the Human Relations Act. SEPTA's complaint lists only the name of the complainants, the date the complaints were filed and the type of discrimination being alleged. The record contains no more specific information such as whether each complainant was a SEPTA employee or customer, or the details of the alleged incidents.

sexual orientation.[7]  *Id.*; R.R. 95a.  SEPTA responded that as a Commonwealth agency, the Philadelphia Commission lacked jurisdiction over it.  SEPTA requested the Philadelphia Commission dismiss each of the administrative complaints or certify them for an interlocutory appeal to address the jurisdiction issue.  The Philadelphia Commission denied SEPTA's requests.

On July 23, 2009, while the administrative complaints were pending, SEPTA filed the instant complaint against the City and the Philadelphia Commission (collectively, City).[8]  SEPTA sought a declaration that the Fair Practices Ordinance does not apply to SEPTA because it is a Commonwealth agency.  SEPTA also sought an injunction against the Philadelphia Commission's exercise of jurisdiction over SEPTA.[9]

The City filed preliminary objections demurring to SEPTA's complaint.  On November 9, 2009, after briefing and argument, the trial court sustained the City's preliminary objections and dismissed SEPTA's complaint for

---

[7] The complaint based on gender identity was brought by an individual that identifies as female and purchased a bus pass listing her gender as female; however, the surgery has not yet taken place.  Bus passes cannot be shared or transferred to another passenger.  The bus driver questioned the proffered pass saying, "You don't look like a female.  Are you a male?"  Faced with the bus driver's opposition to using the bus pass, the passenger paid the cash fare to ride the bus.  Paul Nussbaum, *City to probe transit rider's gender ID complaint*, PHILADELPHIA INQUIRER, September 20, 2008.  http://articles.philly.com/2008-09-20/news/24991546__1__septa-gender-cash-fare (last visited 8/5/2015).

[8] The seven complaints against SEPTA have not yet been resolved by the Philadelphia Commission.  City's Brief at 7.

[9] The next day, SEPTA filed a motion for preliminary injunction.  The trial court granted the preliminary injunction on the grounds that the City failed to file a timely answer.  The City filed a motion for reconsideration.  The trial court granted the City's motion and vacated the preliminary injunction.  The trial court has not issued an order on the reconsideration of SEPTA's motion for preliminary injunction.

the stated reason that SEPTA had failed to exhaust its administrative remedies and, further, was not exempt from the Fair Practices Ordinance. SEPTA appealed.

This Court, sitting *en banc*, reversed the trial court.[10] *See Southeastern Pennsylvania Transportation Authority v. City of Philadelphia and Philadelphia Commission on Human Relations*, 20 A.3d 558 (Pa. Cmwlth. 2011). This Court concluded that SEPTA is a Commonwealth agency for purposes of discrimination claims and, as such, subject only to the Pennsylvania Human Relations Act. We stated:

> [T]he PHRC's [Pennsylvania Human Relations Commission] enabling legislation clearly gives the PHRC, not the [Philadelphia] Commission, jurisdiction over SEPTA as an instrumentality of the Commonwealth in matters involving discrimination. Furthermore, there is no comparable grant of explicit jurisdiction to the [Philadelphia] Commission through its enabling ordinance, and any such grant would clearly conflict with the PHRC's enabling statute.

*Id*. at 562. Because the Philadelphia Commission lacked jurisdiction over SEPTA, this Court held that the exhaustion of remedies doctrine did not preclude SEPTA's pursuit of declaratory and injunctive relief.

The Pennsylvania Supreme Court vacated this Court's order and remanded for further proceedings. *See Southeastern Pennsylvania Transportation*

---

[10] When an appellate court considers whether preliminary objections in the nature of a demurrer were properly sustained, the standard of review is *de novo* and the scope of review is plenary. *Mazur v. Trinity Area School District*, 961 A.2d 96, 101 (Pa. 2008). A demurrer is properly sustained only if, based on the facts pleaded, it is clear and free from doubt that no recovery is possible. *Id*. If any doubt exists, it should be resolved in favor of overruling the demurrer. *Cornelius v. Roberts*, 71 A.3d 345, 347 n.2 (Pa. Cmwlth. 2013). The court must accept as true all well-pleaded, material and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts. *Id*.

6

*Authority v. City of Philadelphia and Philadelphia Commission on Human Relations*, 101 A.3d 79 (Pa. 2014) (*SEPTA v. Philadelphia II)*. The Supreme Court agreed that SEPTA was not required to exhaust its administrative remedies before commencing its action, which presented a purely legal challenge. The Supreme Court also agreed that SEPTA is a Commonwealth agency.[11] However, it concluded that this Court failed to do the legislative intent analysis announced in *Department of General Services v. Ogontz Area Neighbors Association*, 483 A.2d 448 (Pa. 1984), and used to determine when a state agency may be regulated by a local agency.[12] The Supreme Court stated as follows:

> In conclusion, although the Commonwealth Court correctly determined that SEPTA was not required in this instance to exhaust its administrative remedies before commencing this declaratory judgment action, it erred by not applying the *Ogontz* legislative intent analysis to determine whether SEPTA may properly be held to the provisions of the [Fair Practices Ordinance] and the jurisdiction of the Philadelphia Commission. We therefore vacate the Commonwealth Court's order and remand the case to that court for it to conduct that analysis.

*SEPTA v. Philadelphia II*, 101 A.3d at 90-91. Accordingly, we do that analysis here.[13]

---

[11] The Supreme Court stated that "SEPTA has mistaken our insistence that courts seek out and effectuate the intent of the legislature for a requirement that the legislature state its intent clearly or explicitly that a municipality is to have 'preeminent powers' over a state agency in a given area of law." *SEPTA v. Philadelphia II*, 101 A.3d at 87.

[12] Three Justices authored dissents, with two of them opining that this Court had already performed the legislative intent analysis.

[13] This case involves an issue of statutory interpretation, which is a pure question of law. *Philomeno & Salamone v. Board of Supervisors of Upper Merion Township*, 966 A.2d 1109, 1111 (Pa. 2009). Questions of law are subject to *de novo* review, and our scope of review is plenary. *Id.*

7

### *Ogontz* Test

At issue in *Ogontz* was the Commonwealth's proposed construction of a mental health facility in a Philadelphia neighborhood that was zoned residential. The Philadelphia Zoning Board of Adjustment denied the Department of General Services' permit application because the proposed use was not permitted in a residential district. The Department appealed, arguing that the Zoning Board could not impose any restrictions on the construction of a building authorized by a state statute. In considering that legal question, the Pennsylvania Supreme Court established the analysis to be used "[w]hen there is an apparent conflict in the use of ... powers" by two different governmental entities or agencies. *Ogontz*, 483 A.2d at 453-54 (quoting *City of Pittsburgh v. Commonwealth*, 360 A.2d 607, 612 (Pa. 1976)).

Noting that both government agencies were creatures of statute, the Supreme Court identified the Department's preemption claim as one of statutory construction:

> [T]he conflict that arises when a Commonwealth agency seeks to utilize real property in a manner that conflicts with a municipal corporation's zoning regulations is not a contest between superior and inferior governmental entities, but instead a contest between two instrumentalities of the state. The legislature has the power to regulate both of these governmental entities, enlarging or restricting their authority to act; and generally, *the task of courts in these cases is to determine, through an examination of the enabling statutes applicable to each of the governmental entities, which the legislature intended to have preeminent powers. The problem, essentially, is one of statutory interpretation.*

*Ogontz*, 483 A.2d at 452 (internal citation omitted) (emphasis added). The Supreme Court adopted a two-part test for resolving this statutory construction

8

problem. First, a reviewing court must determine whether one legislative scheme was intended to have priority over the other. Second, where that priority cannot be discerned, the court must

> turn to the statutory construction rule that legislative intent may be determined by a consideration, *inter alia*, of the consequences of a particular interpretation. Statutory Construction Act, 1 Pa. C.S.A. §1921(c)(6).

*Id*. at 455.

Concluding that the statutes relevant to the proposed mental health facility did not provide a clear answer on priority, the *Ogontz* court considered the consequences of having the Department or the City prevail in the controversy. It concluded that upholding the zoning ordinance would not frustrate the Commonwealth's ability to build mental health facilities. The Court reasoned as follows:

> The consequences of deciding that the Commonwealth should be preeminent in this matter are that Philadelphia's zoning scheme would be frustrated in this case and in every other case where a Commonwealth land use plan conflicted with the city plan. On the other hand, if the city were to prevail, the Commonwealth's mandate to establish mental health facilities at various locations in the state would not necessarily be frustrated, for the loss of one location might well be compensated for by substitution of another. *Thus, deciding that the city's zoning authority supersedes that of the Commonwealth agency to establish a mental health facility in a particular geographical location arguably would give effect to the legislative mandates of both governmental entities, a consequence which, absent more certain legislative direction, seems advisable*. Accordingly, we hold that [the Department] is subject to the jurisdiction of the Zoning Board and that in the case of a conflict between [the Department's] land use plans and the zoning use regulatory scheme of Philadelphia, the zoning scheme shall prevail.

9

*Id.* (emphasis added).

Thus, *Ogontz* teaches that if there is a clear legislative directive as to which agency should be preeminent in a given situation, that directive controls. If there is no clear expression of legislative intent, courts must try to glean legislative intent in a way that gives effect to the mandates of both agencies, if possible. As instructed by the Supreme Court in its remand order, we consider the two-part test announced in *Ogontz*, beginning with whether the relevant statutes express a clear legislative directive on priority.

## Legislative Priority

SEPTA argues that the applicable statutes demonstrate a legislative intent not to subject SEPTA to the Fair Practices Ordinance. This is because SEPTA's enabling statute grants SEPTA immunity from suit, except where sovereign immunity has been expressly waived. The legislature has waived SEPTA's sovereign immunity for discrimination under the Pennsylvania Human Relations Act but nowhere else, including in the First Class City Home Rule Act. SEPTA urges that because legislative intent is clear, there is no need to analyze the consequences of a particular statutory interpretation.

The City responds that SEPTA's enabling act does not answer the question of legislative intent. If it did, there would have been no need for the Supreme Court to remand for this Court to perform an *Ogontz* analysis. The City argues that enforcement of its Fair Practices Ordinance does not conflict with SEPTA's enabling act. The Pennsylvania Human Relations Act specifies that it was not intended to repeal or supersede a municipality's anti-discrimination ordinance. The City believes this expresses the legislative intent that local municipalities may operate concurrently with the Pennsylvania Human Relations

10

Commission, with overlapping jurisdiction.[14]

The Metropolitan Transportation Authorities Act, as noted *supra*, confirmed that SEPTA is a Commonwealth instrumentality and agency. Section 1711(a) states:

> An authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but *shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.*

74 Pa. C.S. §1711(a) (emphasis added). The Metropolitan Transportation Authorities Act also established that SEPTA enjoys sovereign immunity. Section 1711(c) states, in relevant part, as follows:

> *It is hereby declared to be the intent of the General Assembly that an authority created or existing under this chapter*, including any authority established under the former provisions of Article II of the Pennsylvania Urban Mass Transportation Law or the former provisions of Chapter 15, and the members, officers, officials and employees of any of them, *shall continue to enjoy sovereign and official immunity, as provided in 1 Pa.C.S. § 2310* (relating to sovereign immunity reaffirmed; specific waiver), *and shall remain immune from suit* except as provided by and subject to the provision of 42 Pa.C.S. §§ 8501 (relating to definitions) through 8528 (relating to limitations on damages).

74 Pa. C.S. §1711(c)(3) (emphasis added). In turn, 1 Pa. C.S. §2310 states:

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the

---

[14] The American Civil Liberties Union of Pennsylvania and the Mazzoni Center, a self-described provider of health care services to Philadelphia's lesbian, gay, bisexual and transgender communities, have filed an *amici curiae* brief taking the position that SEPTA is subject to the Fair Practices Ordinance.

General Assembly that *the Commonwealth*, and its officials and employees acting within the scope of their duties, *shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.* When the General Assembly specifically waives sovereign immunity, *a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed* by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) *unless otherwise specifically authorized by statute*.

1 Pa. C.S. §2310 (emphasis added). In short, suits against the Commonwealth are "permissible only where the legislature has *expressly waived* immunity." *Ebersole v. Southeastern Pennsylvania Transportation Authority*, 111 A.3d 286, 289 (Pa. Cmwlth. 2015) (emphasis added).

The Pennsylvania Human Relations Act prohibits discrimination in employment, housing and public accommodation by, *inter alia*, a person or employer. Pursuant to Section 4 of the Act, a "person" includes "the Commonwealth of Pennsylvania, and all political subdivisions, authorities, boards and commissions thereof," 43 P.S. §954(a), and an "employer" includes "the Commonwealth or any political subdivision or board, department, commission or school district thereof." 43 P.S. §954(b). It is beyond peradventure that SEPTA is subject to the Pennsylvania Human Relations Act.[15] Thus, the legislature has

---

[15] The City argues that SEPTA should not be treated as the Commonwealth for purposes of the Pennsylvania Human Relations Act, noting that the Court's prior ruling in this case was vacated by the Supreme Court in *SEPTA v. Philadelphia II,* 101 A.3d 79. The Supreme Court did not hold that SEPTA should not be treated as the Commonwealth for purposes of the Pennsylvania Human Relations Act. To the contrary, the Supreme Court agreed that SEPTA is a Commonwealth agency pursuant to its enabling act for purposes of this case. *Id.* at 87 (referring to SEPTA as a "state agency.").

12

"specifically" waived SEPTA's immunity from actions brought under the Pennsylvania Human Relations Act. 1 Pa. C.S. §2310.

In order to make SEPTA also subject to the Fair Practices Ordinance, the legislature would have had to "specifically" waive SEPTA's immunity from actions brought under local anti-discrimination ordinances. It did not do so.

The City relies upon the First Class City Home Rule Act as the basis for its authority to enforce the Fair Practices Ordinance against SEPTA. Our Supreme Court held that the Home Rule Act is not dispositive, explaining:

> We consider the rule that a home-rule municipality's exercise of legislative power is presumed valid, absent a specific constitutional or statutory limitation, to relate to a municipality's authority to enact ordinances regarding a particular subject matter. That rule does not pertain to whether the municipality may enforce ordinances and regulations against a Commonwealth agency or instrumentality.

*SEPTA v. Philadelphia II*, 101 A.3d at 88. Simply, the Home Rule Act does not waive the immunity of Commonwealth agencies with the specificity required by 1 Pa. C.S. §2310.

The City also argues that the General Assembly has not prohibited its application of the Fair Practices Ordinance to SEPTA or other Commonwealth agencies. Commonwealth agencies must abide by the City's zoning and traffic ordinances. Likewise, it argues, they must abide by the City's anti-discrimination ordinance.

This argument overlooks two important points. First, the anti-discrimination law is unlike zoning and traffic ordinances. Philadelphia alone regulates zoning and traffic control within the City. Therefore, if SEPTA were not subject to the City's zoning and traffic ordinances, there would be a regulatory

13

vacuum leaving SEPTA with *carte blanche* to do as it pleased in these important areas. This would produce an absurd result. On the other hand, the Fair Practices Ordinance is not the only anti-discrimination law applicable in Philadelphia. As discussed *supra*, SEPTA is subject to the Pennsylvania Human Relations Act, which prohibits SEPTA from discriminating against its employees and passengers. Second, the Fair Practices Ordinance authorizes private individuals to sue SEPTA for monetary damages, and SEPTA has been granted immunity from such damages.[16]

Section 1122 of the Fair Practices Ordinance authorizes a private right of action in the Philadelphia County Court of Common Pleas for damages. PHILA. CODE §9-1122. The ordinance also authorizes the Philadelphia Commission to award compensatory damages, punitive damages, attorneys' fees and payment of the Commission's own expenses. PHILA. CODE §§9-1105, 9-1107.[17] In this

---

[16] Indeed, as observed by the *amici curiae*, "[f]or those SEPTA employees or riders who identify as lesbian, gay, bisexual or transgender, their ability to pursue claims before the local Human Relations Commissions is literally the difference between having their 'day in court' and having no legal recourse at all." *Amici Curiae* Brief at 4.

[17] Sections 1105 and 1107 of the Fair Practices Ordinance state as follows:

§9-1105 Remedies for Unlawful Employment Practices.

(1) In addition to the relief authorized by §9-1121 (relating to penalties), the Commission may issue an order directing a respondent who has engaged in an unlawful employment practice to take affirmative action to redress the harms suffered by the complainant. The Commission may order remedies, including, but not limited to:

(a) An order requiring the respondent to cease and desist such unlawful practice;

(b) Any injunctive or other equitable relief, including:

**(Footnote continued on the next page . . .)**

14

respect, the Fair Practices Ordinance veers far away from zoning and traffic ordinances, which are enforced only by the City. As this Court has explained,

---

**(continued . . .)**

> > (.1) hiring, reinstating or upgrading, with or without back pay;
> >
> > (.2) admitting or restoring membership in a labor organization;
> >
> > (.3) admission to a guidance, apprentice-training or retraining program;
>
> (c) Payment of compensatory damages;
>
> (d) Payment of punitive damages, not to exceed $2,000 per violation;
>
> (e) Payment of reasonable attorneys' fees;
>
> (f) Payment of hearing costs as reimbursement for expenses incurred by the Commission.

PHILA. CODE §9-1105.

> §9-1107 Remedies for Unlawful Public Accommodations Practices.
>
> (1) In addition to the relief authorized by §9-1121 (relating to penalties), the Commission may issue an order directing a respondent who has engaged in an unlawful public accommodations practice to take affirmative action to redress the harms suffered by the complainant. The Commission may order remedies, including, but not limited to:
>
> > (a) An order requiring the respondent to cease and desist such unlawful practice;
> >
> > (b) Any injunctive or other equitable relief, including extending full, equal, unsegregated public accommodations, advantages and facilities;
> >
> > (c) Payment of compensatory damages;
> >
> > (d) Payment of punitive damages, not to exceed $2,000 per violation;
> >
> > (e) Payment of reasonable attorneys' fees;
> >
> > (f) Payment of hearing costs as reimbursement for expenses incurred by the Commission.

PHILA. CODE §9-1107.

15

"[a]bsent a legislative abrogation of immunity, no party may seek to obtain relief against the Commonwealth." *New Foundations, Inc. v. Department of General Services*, 893 A.2d 826, 830 (Pa. Cmwlth. 2005). Sovereign immunity bars an action seeking to compel a state party to act or seeking monetary damages, except where the legislature has created an exception. *Finn v. Rendell*, 990 A.2d 100, 105 (Pa. Cmwlth. 2010). Further, punitive damages cannot be recovered from Commonwealth agencies. *Feingold v. Southeastern Pennsylvania Transportation Authority*, 517 A.2d 1270, 1276-77 (Pa. 1986). The penalties authorized by the Fair Practices Ordinance require an express waiver of sovereign immunity, and none has been expressed by the General Assembly.

The City argues, nevertheless, that the Pennsylvania Human Relations Act expresses a waiver of sovereign immunity because it specifies that it does not repeal or supersede any municipal anti-discrimination ordinance. Section 12 of the Pennsylvania Human Relations Act states, in relevant part, as follows:

> (a) The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply.
>
> (b) Except as provided in subsection (c), nothing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance, municipal charter or of any law of this Commonwealth relating to discrimination because of race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability[.]… In the event of a conflict between the interpretation of a provision of this act and the interpretation of a similar provision contained in any municipal ordinance, the interpretation of the provision in this act shall apply to such municipal ordinance.

43 P.S. §962(a), (b).[18]  The City contends that Section 12 means, specifically, that the Fair Practices Ordinance can be enforced against SEPTA.

We disagree.  The legislature has waived SEPTA's immunity from suit arising from discrimination by making it subject to the jurisdiction of the Pennsylvania Human Relations Commission.  Exceptions to sovereign immunity are to be narrowly construed.[19]  *Dean v. Department of Transportation*, 751 A.2d 1130, 1134 (Pa. 2000).  Section 12(b) of the Pennsylvania Human Relations Act does not express an intent to subject SEPTA, or any Commonwealth agency, to the Fair Practices Ordinance.[20]

---

[18] Section 12.1 of the Pennsylvania Human Relations Act authorizes the creation of local human relations commissions and specifies that:

> (d)   The legislative bodies of political subdivisions shall have the authority to grant to local commissions powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act.

> (e)   The local human relations commission shall notify the Pennsylvania Human Relations Commission of complaints received involving discriminatory acts within that commission's jurisdiction.

43 P.S. §962.1.  Section 12.1 was added by the Act of January 24, 1966, P.L.(1965) 1523.

[19] *See* 1 Pa. C.S. §2310 ("the Commonwealth … shall continue to enjoy sovereign immunity … and remain immune from suit except as the General Assembly shall specifically waive the immunity.  … A claim against the Commonwealth … shall be brought only in such manner and in such courts and in such cases as … specifically authorized by statute.").

[20] In his dissent, President Judge Pellegrini posits that the Pennsylvania Human Relations Act gives Philadelphia authority over SEPTA in anti-discrimination matters.  Section 12.1(d) allows local commissions to have "powers and duties *similar to those* now exercised by the Pennsylvania Human Relations Commission." 43 P.S. §962.1(d) (emphasis added).  "Similar" does not mean "identical."  Accordingly, this language does not expressly confer jurisdiction in local commissions to supervise Commonwealth agencies.  Section 12.1(d) does not mean that local commissions have *jurisdiction* over SEPTA.  Section 12(b) of the Human Relations Act specifies that it did not repeal or supersede any municipal law prohibiting discrimination because of "race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability[.]"  43 P.S. §962(b).  Municipalities do have the power to define discrimination in ways that differ from the definition in the Human Relations Act.  *Hartman v. City of Allentown*,
**(Footnote continued on the next page . . .)**

17

In sum, it is apparent from the language of the applicable statutes that the legislature did not intend to subject SEPTA to the Fair Practices Ordinance. Therefore, we need proceed no further in our legislative intent analysis. Nevertheless, for the sake of completeness, we will address the second prong of the *Ogontz* test.

## Consideration of Consequences

The second prong of the *Ogontz* test discerns legislative intent by considering, *inter alia*, the consequences of a particular interpretation. SEPTA argues that to subject it to the Fair Practices Ordinance would add another layer of regulation in addition to that provided in federal and state civil rights laws.[21] This would cause confusion because, *inter alia*, its service area extends beyond Philadelphia. SEPTA will expend scarce resources on a daunting legal investigation of what it can do and where it can do it, and not on its central mission of providing public transportation services.

On the other hand, finding in favor of SEPTA will protect the public fisc, a vital consideration. Exempting SEPTA from the Fair Practices Ordinance still leaves SEPTA subject to the Pennsylvania Human Relations Act. SEPTA

---

**(continued . . .)**

880 A.2d 737 (Pa. Cmwlth. 2005). However, the source of the power to do so is the police power under the municipality's enabling act, not the Human Relations Act. Section 12(b)'s savings clause is silent as to the municipality's authority over state agencies and, thus, does not confer power on the City to enforce the Fair Practices Ordinance against state agencies.

[21] It is undisputed that SEPTA is subject to the jurisdiction of the Pennsylvania Human Relations Commission and the United States Equal Employment Opportunity Commission. SEPTA is also subject to Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of "race, color or national origin" when providing public transportation, 42 U.S.C. §2000d, and Title VII which prohibits employment discrimination on the basis of "race, color, religion, sex or national origin." 42 U.S.C. §2000e-2.

cannot engage in invidious discrimination at will and does not wish to do so. It is up to the General Assembly, not the City, to amend the Pennsylvania Human Relations Act to enlarge the categories of citizens protected from invidious discrimination. The Fair Practices Ordinance expressly excludes religious employers and the United States government from its terms. Excluding Commonwealth agencies from its reach is consistent with the policy to exclude federal agencies.[22]

The City responds that the consequences of applying the Fair Practices Ordinance to SEPTA weigh strongly in favor of coverage. If SEPTA can comply with the City's traffic ordinances, it can comply with the Fair Practices Ordinance. Further, forbearing from acts of discrimination will not adversely affect SEPTA's core mission of providing efficient transportation; to the contrary, non-discrimination should be part of SEPTA's central mission. SEPTA's concerns about confusing multi-jurisdictional regulation is addressed by compliance with the strictest anti-discrimination laws, *i.e.,* the Fair Practices Ordinance.[23] It is

---

[22] SEPTA argues that a remand is needed for the development of a record regarding the consequences of subjecting SEPTA to the Fair Practices Ordinance. Judge Simpson's dissent agrees with this point. The City argues that a record is unnecessary. The task of statutory construction includes consideration of the "consequences of a particular interpretation," 1 Pa. C.S. §1921, and the "proper construction of a statute is resolvable by a court as a matter of law." *Allegheny County Sportsmen's League v. Rendell,* 860 A.2d 10, 24 (Pa. 2004). Thus, the *Ogontz* consideration of the consequences of a particular statutory interpretation is a legal, not a factual, question that does not require evidence. Consequences can be posited by the Court.

*Ogontz* did not cite facts in its consequences analysis. The only case where the *Ogontz* test was applied outside the context of land use is *Saucon Valley School District v. Robert,* 785 A.2d 1069 (Pa. Cmwlth. 2001). In *Saucon,* this Court posited the consequences without reference to record evidence.

[23] The Fair Practices Ordinance and the Pennsylvania Human Relations Act define protected classes differently. The language differences may, or may not, have significance. Both proscribe sex discrimination, which is a flexible concept.

19

irrelevant that applying the Fair Practices Ordinance to SEPTA may have significance to other Commonwealth agencies. It is not clear that it would because the *Ogontz* analysis could vary depending on the facts of a case. Finally, the City contends that it is irrelevant that the City has excluded some employers from the Fair Practices Ordinance's coverage. The relevant question is whether an *Ogontz* analysis favors application of the Fair Practices Ordinance to SEPTA, an entity headquartered in Philadelphia that employs 9,000 people and provides transportation to a large percentage of the City's population.

We agree that the focus is on SEPTA in this prong of the *Ogontz* analysis and not on other persons the City has exempted from the Fair Practices Ordinance. However, we conclude that a consideration of the consequences of subjecting SEPTA to the Fair Practices Ordinance leads to the conclusion that the legislature did not intend this result.

SEPTA operates in Philadelphia, but also in Bucks, Chester, Delaware and Montgomery Counties. Each county contains numerous municipalities.[24] "[A]ll municipalities have the authority to enact anti-discrimination laws pursuant to their police powers." *Building Owners and Managers Association of Pittsburgh v. City of Pittsburgh*, 985 A.2d 711, 715 n.12 (Pa. 2009). This means that if SEPTA is subject to the provisions of the Fair Practices Ordinance, it would also be subject to anti-discrimination legislation enacted by any of the over 100 municipalities through which it operates its various bus, train and trolley routes. The compliance problems are myriad. Were SEPTA subject to the anti-

---

[24] There are 54 municipalities in Bucks County, 73 in Chester County, 49 in Delaware County and 62 in Montgomery County. *See also SEPTA v. Philadelphia II*, 101 A.3d at 97 (Eakin, J., concurring and dissenting) (explaining that SEPTA operates "in over 100 municipalities across southeastern Pennsylvania.").

20

discrimination ordinances of each municipality, its legal obligations would change in the course of a single bus trip. Compliance would require learning the content of every municipality's ordinance as well as constant monitoring of each ordinance to remain current, and training all employees accordingly. The City contends that SEPTA simply needs to comply with the City's ordinance, which it claims to be the strictest. Nevertheless, any of the 100 municipalities may adopt an ordinance stricter than the City's at any time.

SEPTA receives its funding from state and federal sources, and to a much lesser extent, local sources in the areas it serves. A primary purpose of sovereign immunity is "protection of the public fisc." *Frazier v. Workers' Compensation Appeal Board (Bayada Nurses, Inc.)*, 52 A.3d 241, 250 (Pa. 2012). Spending these funds to ensure compliance with any potential number of different local anti-discrimination statutes would divert them away from SEPTA's core mission of providing public transportation.

Simply put, subjecting SEPTA to local anti-discrimination laws could prove overwhelming. Courts must presume that the legislature did not intend a result that is unreasonable or absurd where the legislature's intent is not clear. 1 Pa. C.S. §1922(1). Thus, even if the intent of the legislature were not apparent from the language of the applicable statutes, we would conclude that the consequences of finding in SEPTA's favor are far less problematic than a ruling that SEPTA is subject to the Fair Practices Ordinance. SEPTA is still subject to federal and state anti-discrimination statutes.

21

## Conclusion

In sum, we conclude that the legislature did not intend for SEPTA to be subject to the Philadelphia Fair Practices Ordinance or the jurisdiction of the Philadelphia Commission.

Accordingly, the order of the trial court sustaining the preliminary objections of the City and Philadelphia Commission is reversed. The matter is remanded for further proceedings consistent with this opinion.

_____
MARY HANNAH LEAVITT, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Southeastern Pennsylvania　　　:
Transportation Authority,　　　　:
　　　　　　　　Appellant　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　　:　　No. 2445 C.D. 2009
　　　　　　　　　　　　　　　　　　:
City of Philadelphia and　　　　　:
Philadelphia Commission on　　　　:
Human Relations　　　　　　　　　:

# **O R D E R**

AND NOW, this 7th day of August, 2015, the order of the Court of Common Pleas of Philadelphia County sustaining the preliminary objections filed by the City of Philadelphia and the Philadelphia Commission on Human Relations in the above-captioned matter is hereby REVERSED. The matter is REMANDED for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　MARY HANNAH LEAVITT, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Southeastern Pennsylvania | : | |
| Transportation Authority, | : | |
| Appellant | : | |
| | : | |
| v. | : No. 2445 C.D. 2009 |
| | : Argued: February 11, 2015 |
| City of Philadelphia and | : | |
| Philadelphia Commission on | : | |
| Human Relations | : | |

BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
               HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE ROBERT SIMPSON, Judge
               HONORABLE MARY HANNAH LEAVITT, Judge
               HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE ANNE E. COVEY, Judge

DISSENTING OPINION BY
PRESIDENT JUDGE PELLEGRINI          FILED: August 7, 2015

       The question in this case is whether the Southeastern Pennsylvania Transportation Authority (SEPTA) is subject to the City of Philadelphia's (Philadelphia) anti-discrimination ordinances enacted pursuant to a grant of power in the First Class City Home Rule Act[1] and the Pennsylvania Human Relations Act (PHRA).[2]

---

[1] Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§13101-13157.

[2] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§951-963.

In finding that SEPTA is not subject to those ordinances, as instructed on remand, the majority conducts an analysis as set forth in *Department of General Services v. Ogontz Area Neighbors Association*, 483 A.2d 448 (Pa. 1984), to determine which entity prevails "[w]hen there is an apparent conflict in the use of ... powers" by two different governmental entities or agencies. *Ogontz*, 483 A.2d at 453-54 (quoting *City of Pittsburgh v. Commonwealth*, 360 A.2d 607, 612 (Pa. 1976)). Noting that both government agencies were creatures of statute, our Supreme Court adopted a two-part test for resolving this statutory construction problem. First, it must be determined whether one legislative scheme was intended to have priority over the other. Second, if that priority cannot be discerned, courts must try to glean legislative intent in a way that "would give effect to the legislative mandates of both governmental entities." *Id* at 455.

Employing a common set of tropes, the majority finds under the first prong of *Ogontz* that SEPTA has legislative priority because it is "an instrument of the Commonwealth" that leads the majority to what it considers a certain narrative inevitability that SEPTA's interests in running a "transportation system" are paramount over Philadelphia's interest in enacting and enforcing human relations ordinances specifically authorized by the General Assembly to root out invidious discrimination.

As to the second prong, the majority succumbs and blindly accepts SEPTA's baseless claims, without any evidence, that if subject to local human relations ordinances, SEPTA somehow could not carry out its transportation responsibilities because it would be required to know what each local human relations

ordinance provides in the 100 different municipalities in which it operates, again, "without proof" that each of those municipalities has a human relations ordinance.

I respectfully dissent because, under the first prong of *Ogontz*, SEPTA is subject to charges of discrimination brought under Philadelphia's anti-discrimination ordinances because it is clear under the Constitution and the legislative scheme that Philadelphia's interests in eliminating discrimination are paramount under the grants of power given to it as compared to the powers given to SEPTA by the General Assembly. If we even need to get to the second prong, both mandates of both agencies would not be impeded if SEPTA is made subject to Philadelphia's anti-discrimination ordinances because Philadelphia would be able to carry out its legislative mandate without in any way impeding SEPTA's ability to provide public transportation.

Moreover, the consequences subjecting SEPTA to Philadelphia's anti-discrimination ordinances as well as any other relevant local laws is no more than an inconvenience that any multi-jurisdictional private business is subject to in order to operate. However, the consequence of failing to apply those anti-discrimination ordinances is that Philadelphia residents would not be protected by the anti-discrimination ordinances which, in addition to the local enforcement of the traditional subjects of discrimination, also forbid discrimination on the basis of a person's sexual orientation and gender identity which are classes not protected by the state PHRA. The majority acknowledges this "is at the heart of the current controversy" because it was not until after those types of claims of anti-

discrimination were raised that SEPTA claimed that it was not subject to Philadelphia's anti-discrimination ordinances.

## I.

Under the first prong of the *Ogontz* test, we must examine the legislative scheme to determine which governmental entity has priority. In this case, this prong is particularly important because this is the first case involving an authority, SEPTA, an entity that is not directly controlled by elected officials.

## A.

SEPTA, headquartered in Philadelphia, was created in 1963 pursuant to the Metropolitan Transportation Authorities Act, 74 Pa. C.S. §§1701-1785, to provide public transportation in the area commonly known, as the SEPTA name suggests, the five counties commonly identified as Southeastern Pennsylvania – Philadelphia, Bucks, Chester, Delaware and Montgomery counties. 74 Pa. C.S. §1713. When operating outside those counties, SEPTA is treated just like any private common carrier and must obtain a certificate of public convenience from the appropriate regulatory agency. 74 Pa. C.S. §1711.

SEPTA is governed by a 15-member Board. Uniquely, while Philadelphia appoints only two members to the Board, those two members can veto any item that is approved by the full SEPTA Board unless that veto is overridden with the vote of at least 75% of the full Board within 30 days. The other four counties appoint two members each. Of the remaining five members on the Board,

the Governor and majority and minority leaders of the two houses of the Pennsylvania State Legislature appoint one member each.

Though the Commonwealth does not have power to appoint a majority of its Board members, Section 1711(a) further states that "[a]n authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public *powers of the Commonwealth as an agency and instrumentality thereof*." 74 Pa. C.S. §1711(a) (emphasis added).

Notwithstanding that language, SEPTA is not considered to be the same as the Commonwealth. In *Southeastern Pennsylvania Transportation Authority v. Union Switch & Signal, Inc.,* 637 A.2d 662, 665 (Pa. Cmwlth.), *appeal denied*, 648 A.2d 792 (Pa. 1994), we stated the difficulty in determining the status of SEPTA or, for that matter, any authority, is directly related to the reasons behind its creation and authorization by the General Assembly. We explained:

> Although authorities owe their existence to the various units of government and their governing boards are appointed by those entities, they are not considered part of the normal governmental structure. Unlike municipal corporations that have "governmental" and "proprietary" functions, authorities engage only in the latter. Authorities are "public corporations, being corporate agencies engaged in the administration of civil government." Generally, authorities are established for the purpose of financing and managing various revenue producing projects of a public nature or other activities that are not considered to be part of core governmental activities; they are a governmental business venture, a form of quasi-privatization. (Citations and footnotes omitted)

*Id.*

SEPTA was created to take over the business of providing transportation that was formerly provided by private transportation companies such as the Philadelphia Transportation Company, Philadelphia Suburban Transportation, Schuylkill Valley Lines and/or the Penn Central and Conrail. *See Application of Philadelphia Suburban Transportation Co.*, 264 A.2d 180 (Pa. Super. 1970); *Southeastern Pennsylvania Transportation Authority v. Philadelphia Transportation Co.*, 38 Pa. D. & C. 2d 653, 654-55 (1965). In short, SEPTA is in the transportation business, not in the business of governing.

## B.

While it is often said that "municipalities are creatures of the General Assembly," that formulation has not be accurate since our Constitution was amended in 1968 to provide that "[t]he General Assembly shall provide by general law for local government within the Commonwealth." Pa. Const. art. IX, §1. The Pennsylvania Constitution also provides that "[m]unicipalities shall have the right and power to frame and adopt home rule charters," and that pursuant to such charters, a home rule municipality "may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." Pa. Const. art. IX, §2. Precisely speaking, municipalities are not creatures of the General Assembly, but creatures of the Constitution created to mandate that local matters be addressed by local citizens and the officials that they elect.

Philadelphia is a home rule municipality authorized by the General Assembly by the First Class City Home Rule Act.[3] Section 17 of the First Class City Home Rule Act provides that a city "taking advantage of this act and ... amending its charter thereunder shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions ... [,]" subject to certain enumerated limitations. 53 P.S. §13131.

Unlike SEPTA, which is truly a mere creature of statute whose existence could be extinguished by the General Assembly and which is likely to occur if a private concern would offer to take over its transportation responsibilities, Philadelphia is a creature of the constitution charged with governance at the local level. It is for this reason that the General Assembly provided in a clear and unequivocal statement its intent that a quasi-governmental agency like SEPTA is predominant and is exempt from local regulation.

---

[3] Philadelphia became a home rule municipality under the First Class City Home Rule Act. Pennsylvania initially adopted home rule in a 1922 Amendment to Article 15, Section 1 of the Constitution of 1874, which provided:

> Cities or cities of any particular class may be given the right and power to adopt their local charters and to exercise the powers and authorities of local self-governments, subject however, to such restrictions, limitations and regulations as may be imposed by the legislature.

In the half century that the 1922 Amendment was in effect, only one city, Philadelphia, was granted home rule status by the General Assembly. In 1968, the Constitution was amended to require the General Assembly to grant more local municipalities home rule power.

## C.

When the Philadelphia Home Rule Charter was adopted in 1951, it created the Philadelphia Commission on Human Relations to hear and enforce the Philadelphia Fair Practices Ordinance. It prohibits discrimination in the areas of: employment; housing and public accommodations; ethnicity; color; sex; sexual orientation, gender identity; religion; national origin; ancestry; age; disability; marital status; familial status; genetic information; or domestic or sexual violence victim status. Philadelphia Code §§9-1103, 9-1106.

In 1955, the General Assembly enacted the PHRA, which forbids discrimination in the areas of employment, housing and public accommodations on the basis of "race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability, use of guide or support animals because of the blindness, deafness or physical handicap of the user…." Section 2 of the PHRA, 43 P.S. §952. Its reach is statewide.

However, when enacting the PHRA, the General Assembly did not preempt local regulation. To the contrary, the General Assembly took that position that the more attention addressed to eliminate invidious discrimination the better, and authorized local governments to enact their own human relations ordinances. Section 12.1(a) of the PHRA states, in pertinent part, that "[t]he legislative body of a political subdivision may, by ordinance or resolution, authorize the establishment of membership in and support of a Local Human Relations Commission." Added by the Act of January 24, 1966, P.L. (1965) 1523, *as amended*, 43 P.S. §962.1(a). Section 12.1(d) states that "legislative bodies of political subdivisions shall have the authority

to grant to local commissions powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act." 43 P.S. §962.1(d).

In *Hartman v. City of Allentown*, 880 A.2d 737 (Pa. Cmwlth. 2005), we said that the grant of power extended to local commissions to forbid discrimination against other groups because the grant of power by the General Assembly was to allow local governments to address matters of local concern at the local level and to devote additional resources that the Commonwealth may not have to address a more immediate concern. Addressing invidious discrimination is a matter of heightened concern for Philadelphia because a substantial number of its citizens are African-Americans and gay, not to mention that a majority of SEPTA's riders are African-Americans and women.

There is nothing in the legislative scheme that would suggest that SEPTA's interests should predominate over the Commonwealth's; everything suggests that Philadelphia's governmental interest predominates. Philadelphia is a home rule municipality that has police powers to address invidious discrimination, and the General Assembly has given it the power and encouraged it to enact its own human relations ordinances and to enforce them. There is no conflict in the legislative scheme between Philadelphia's enforcement of its Fair Practices Ordinance and SEPTA's legislative scheme to carry on its transportation business. Under the first prong of the *Ogontz* test, the relevant statutes express a clear legislative directive that Philadelphia has priority to enforce its Fair Practices Ordinance so that SEPTA cannot engage in invidious discrimination.

## III.

### A.

The majority does not seem to disagree that under the legislative scheme alone, Philadelphia has priority to enforce its Fair Practices Ordinance. Apparently, it would hold that SEPTA is subject to Philadelphia's zoning and traffic laws, but for the reasons outside the first prong of *Ogontz*, it finds that SEPTA is not subject to the Philadelphia Fair Practices Act.

The first reason that the majority posits as to why Philadelphia's legislative scheme predominates in zoning and traffic but not in anti-discrimination ordinances is that there would be a regulatory vacuum leaving SEPTA to do as it pleased in these important areas if SEPTA is not subject to Philadelphia's zoning and traffic ordinances. It goes on to say that because SEPTA is subject to the jurisdiction of the Pennsylvania Human Relations Commission, then even if not subject to Philadelphia's Fair Practices Ordinance, SEPTA is, nevertheless, prohibited by law from discriminating against its employees and customers. It seems to be suggesting that "a no harm-no foul" rationale applies.

However, under the first prong of *Ogontz*, we just look to see if there is a legislative priority of one agency over the other; we do not consider an extraneous and irrelevant factor of whether there is some third agency that can "pick up the slack" if we ignore the legislative priority found by examining the relevant statutes regarding those agencies. In any event, there is harm in this case in holding that SEPTA is not under the jurisdiction of a local human relations commission both because of local access and local human relations ordinances which have different

protected classes than the PHRA.  As the majority itself quoted from an amicus brief, "[f]or those SEPTA employees or riders who identify as lesbian, gay, bisexual or transgender, their ability to pursue claims before the local Human Relations Commission is literally the difference between having their 'day in court' and having no legal recourse at all."  Amici Curiae Brief at 4.  The simple answer is that the General Assembly specifically gave Philadelphia the power to enforce its own discrimination ordinances and gave it concurrent jurisdiction to root out invidious discrimination.

**B.**

The second reason that the majority gives for failing to give Philadelphia priority over SEPTA is that the Fair Practices Ordinance would authorize third parties to sue SEPTA for monetary damages, including compensatory damages, punitive damages, attorneys' fees and payment of the Commission's own expenses. Philadelphia Code §§9-1105, 9-1107.  It does so because employing its favorite trope that SEPTA, as an agency and instrumentality of the Commonwealth, is immune from any such actions under 1 Pa. C.S. §2310, which provides:

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial

procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.

Equating SEPTA with the Commonwealth itself, the majority then reasons that because suits against the Commonwealth are permissible only where the legislature has expressly waived immunity, SEPTA is immune from actions brought under Philadelphia's Fair Practices Law because the General Assembly has not waived immunity under Section 2310. I disagree for a number of reasons.

First, just because it has been determined that SEPTA is an "agency and instrumentality of the Commonwealth" does not mean that it is the Commonwealth. The courts determine an authority's status based on the statute under consideration, and we have looked to the legislative intent to determine whether the General Assembly intended that type of authority to be considered "the Commonwealth." In *Fisher v. Southeastern Pennsylvania Transportation Authority*, 431 A.2d 394, 397 (Pa. Cmwlth. 1981), we stated:

> [W]e do not go so far as to suggest that whenever a legislative enactment refers to the "Commonwealth," it means to embrace all authorities created by virtue of enabling acts. … The legislature many years ago recognized the need for efficient and inexpensive mass transportation systems designed to alleviate serious traffic difficulties in the overcrowded metropolitan areas of the Commonwealth. Thus, SEPTA and other transportation authorities were created pursuant to legislative guidelines designed to provide independent operating powers with minimal local government interference. The grant of broad powers by the Legislature was meant to insure efficient operation of the integrated transportation networks, not to expand the already large and complex state bureaucratic system. We do not believe that the Legislature intended

SEPTA to be a Commonwealth agency in the traditional sense or for SEPTA employees to be considered Commonwealth employees for purposes of other legislative enactments.

In *Union Switch & Signal, Inc.*, a claim was brought by a contractor against SEPTA before the Board of Claims on the basis that, as an agency of the Commonwealth, jurisdiction had to be before the Board of Claims because the Board was designated as having exclusive jurisdiction over contract claims when immunity was waived for such claims. Over SEPTA's objection that the Board of Claims did not have jurisdiction, the Board of Claims refused to dismiss the appeal. SEPTA then appealed to this Court, and we held that the Board of Claims lacked jurisdiction to entertain contract claims against SEPTA because SEPTA is not the "Commonwealth." *Union Switch & Signal, Inc.*, 637 A.2d at 668-69. *See also Quinn v. Southeastern Pennsylvania Transportation Authority*, 659 A.2d 613 (Pa. Cmwlth. 1995) (holding that SEPTA was a local agency and not an agency of the Commonwealth for jurisdictional purposes and, thus, the court of common pleas had jurisdiction over the appeal); *Fraternal Order of Transit Police By and Through Lamb v. Southeastern Pennsylvania Transportation Authority*, 668 A.2d 270 (Pa. Cmwlth. 1995) (same); *Bolden v. Southeastern Pennsylvania Transportation Authority,* 953 F.2d 807 (3rd Cir. 1991), *cert. denied*, 504 U.S. 943 (1992) (holding that SEPTA was not the "Commonwealth" and not entitled to immunity under the Eleventh Amendment to the United States Constitution).

Second, even if it was the Commonwealth, the General Assembly has waived immunity for actions against SEPTA brought under local human relations ordinances. To determine whether the General Assembly intended SEPTA to be

immune from actions brought under local human relations ordinances, the majority acknowledges that the General Assembly has waived SEPTA's immunity from suits arising from discrimination by making it subject to the jurisdiction of the Pennsylvania Human Relations Commission.

As mentioned before, Section 12.1(d) of the PHRA states that "legislative bodies of political subdivisions shall have the authority to grant to local commissions powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act." 43 P.S. §962.1(d). Under this provision, similar powers and duties that are exercised by the Pennsylvania Human Relations Commission can be exercised by the Philadelphia Commission on Human Relations. Part of the power given under this provision to local human relations commissions is jurisdiction over Commonwealth agencies to root out invidious discrimination.[4]

_____

[4] In footnote 20, the majority responds to my dissent by saying that while the General Assembly gave "powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act" in Section 12.1(d) of the PHRA, 43 P.S. §962.1(d), that does not mean that it gave local commissions jurisdiction over SEPTA. The point of the dissent, though, was because the General Assembly gave to the Pennsylvania Human Relations Commission power over SEPTA, and it gave local commissions' similar power, it must have wanted local commissions to exercise jurisdiction over claims of discrimination by local authorities. It is the same as with local zoning: there is no dispute that SEPTA is subject to local zoning and, necessarily, local zoning boards have jurisdiction.

Acknowledging that because local governments can expand the protected classes set forth in Section 12(b) of the PHRA because the General Assembly only said that local governments could enact similar and not identical human relations ordinances, the majority then goes on to state that because it is not limited by PHRA, that somehow takes away Philadelphia's power over SEPTA. Implicit in that argument is that if the General Assembly had provided that restricted local human relations ordinances to having identical provisions, Philadelphia would have jurisdiction over SEPTA.
**(Footnote continued on next page…)**

For example, under the Philadelphia Fair Practices Ordinance, an "Employer" is defined as "[a]ny person who does business in the City of Philadelphia through employees or who employs one or more employees exclusive of parents, spouse, Life Partner or children, including any public agency or authority; any agency, authority or other instrumentality of the Commonwealth; and the City, its departments, boards and commissions." Philadelphia Code §9-1102(h). This is similar to the power given to the Pennsylvania Human Relations Commission, and if SEPTA would discriminate against a minority in hiring, it would be subject to the Philadelphia Commission on Human Relations's jurisdiction.

Finally, even if it was true that SEPTA is immune under 1 Pa. C.S. §2310 from monetary damages, that does not mean that SEPTA is not subject to the jurisdiction of the Philadelphia Commission on Human Relations. If it were so, then it is subject to the local human relations ordinance; a complainant could not get monetary damages but that does not mean that other relief is not available. 1 Pa. C.S. §2310 does not make the state immune from prohibitory injunctions to restrain a state

---

**(continued…)**

A more expansive grant of power by the General Assembly does not lead to the conclusion that it did not want the same people and organizations that are subject to PHRA, then not to be subject to local human relations ordinances. Quite the contrary, the General Assembly, by not limiting local human relations ordinances to identical subjects of discrimination, evidenced that it gave local governments the additional power to add provisions necessary to protect suspect classes and, like in PHRA, wanted SEPTA to be made subject to local ordinances just like every other person and business.

Philadelphia has expanded the classes from those set forth in that provision to include sexual orientation, gender identity, marital status, genetic information or domestic or sexual violence victim status. Philadelphia Code §§9-1103, 9-1106. Under the majority view, SEPTA is free to discriminate against those classes of people without any recourse anywhere.

agency from engaging in unlawful conduct. *See Stackhouse v. Pennsylvania State Police*, 892 A.2d 54 (Pa. Cmwlth.), *appeal denied*, 903 A.2d 549 (Pa. 2006). For example, in *City of Pittsburgh v. Commonwealth*, 360 A.2d 607 (Pa. 1976), our Supreme Court held that the Department of Corrections had to comply with local zoning; if the Department of Corrections did not comply, then the municipality could seek an injunction to force it to comply. Similarly, if SEPTA has a practice of not hiring gay people, then under Section 1105(a) of the Fair Practices Ordinance, Philadelphia Code §9-1105(a), the Philadelphia Commission on Human Relations could bring an equity action to cease and desist such an employment practice.

From the foregoing, it is clear from the legislative scheme that the Philadelphia Fair Practices Ordinance, just like its zoning and traffic laws, apply to SEPTA. Not only does the legislative scheme show that, in fact, the General Assembly authorized the local government to engage in adoption and enforcement, along with any concurrent exercise by the Pennsylvania Human Relations Commission by authorizing local governments to enact and enforce local ordinances similar to those that the Pennsylvania Human Relations Commission enforces. Because it is apparent from the language of the applicable statutes that the legislature intended and specifically provided to subject SEPTA to the Fair Practices Ordinance, I need not proceed to the second prong of *Ogontz* but, like the majority, I will do so for the sake of completeness.

## IV.

Under the second prong of *Ogontz*, if the legislative priority cannot be discerned, courts must try to glean legislative intent in a way that "would give effect

to the legislative mandates of both governmental entities." *Id* at 455. The majority adopts SEPTA's argument that it would not be able to carry out its legislative mandate if it was subject to the Philadelphia Fair Practices Ordinance because it would add another layer of regulation provided in federal and state civil rights laws, and its legal obligation would change in the course of a single bus trip because its service area extends beyond Philadelphia. The majority also buys SEPTA's argument that it will be required to expend scarce resources on a daunting legal investigation of what it can do and where it can do it, and not on its central mission of providing public transportation services. The majority concludes that subjecting SEPTA to local anti-discrimination laws could prove overwhelming and damage the public "fisc."

I agree with Judge Simpson that there is nothing on the record to support these conclusions and would join in his dissent of the need to remand to the trial court for factual findings. However, the majority's reasons are so specious that they can be rejected out of hand thereby obviating the need for a remand. Let's look at those reasons proffered by the majority.

First, as to the majority's assumption that it would be a daunting task to keep track of the applicable local human relations ordinance and impede its ability to carry out its public transportation responsibilities. Trucking companies, airlines and private bus companies are subject to these types of regulations in every city that they serve but they still manage to conduct their business, mostly at a profit. If they can do it, SEPTA can do it if it wants to.

Second, the idea that SEPTA cannot keep track of the local human relations ordinance of each municipality in which it operates is ludicrous. This premise is built on the notion that "SEPTA" just travels through these communities in hermetically-sealed tubes letting passengers on and off, and has no contact at all with the local officials in communities in which they operate. However, it has facilities such as tracks, stations, bus shelters, switches, maintenance stations, vending machines and electric lines in each of those communities, yet it somehow manages to keep track of each of those facilities. This is much more difficult than getting an ordinance from the 100 or so municipalities in which SEPTA operates, even if each of them has enacted one.

Not only that, SEPTA manages to know and comply with all the traffic and zoning codes of the various municipalities through which it travels, but the task somehow becomes "daunting" when it involves obtaining the relevant local human relations ordinances. Certainly that task is even less daunting than keeping track of traffic, but especially zoning codes, because the PHRA requires all human relations ordinances to be similar while zoning ordinance are community specific. Moreover, SEPTA's lawyers do not even have to leave the office and can just go to the websites of all the communities that post their ordinances, including human relations provisions, or it could just ask the Pennsylvania Human Relations Commission. If SEPTA's inside and outside lawyers[5] find the task too difficult, perhaps they should

---

[5] That is apparently what the Pennsylvania Association of Realtors did. *See* http://www.parealtor.org/local-nondiscrimination-ordinances. The following site lists the local human relations ordinances that are currently in effect. https://mazzonicenter.org/resources/list-pennsylvania-ordinances-prohibiting-discrimination-based-sexual-orientation-gender-id.

get their station masters, yardmen, maintenance chiefs and landsmen who are in these communities every day to take over that function. It will probably be the easiest thing they have to track.

Third, the idea that SEPTA's compliance with all of these ordinances would be so overwhelming that, as a consequence, its ability to provide transportation services would be impeded because it would require constant monitoring to remain current and all employees would have to be trained accordingly to such an extent belies common sense. Comcast is located in Philadelphia, but operates in certainly more than 100, and probably more than 10,000 communities, and yet, somehow, manages to keep track of these types of ordinance and understands its obligations in each community in which it serves. Moreover, aside from all of these human relation ordinances being similar, instructing all of your employees to act in a fair and non-discriminatory manner should be instilled from the moment of employment. This should not be considered to be a burden, but an opportunity for an "instrumentality of the Commonwealth" to advance the public policy of the Commonwealth. If Comcast can do it, certainly SEPTA can do it if it wants to.

The second dire consequence that the majority identifies is that it would divert resources away from SEPTA's core mission of providing public transportation if it is made subject to local human relations ordinances and must handle and pay damages for those claims. Again, this argument is specious. SEPTA is subject to damages under the PHRA, so even if it was not subject to Philadelphia's Fair Practices Ordinance, the public fisc would not be substantially harmed. In any event,

the General Assembly wanted the public fisc to be harmed if governmental agencies engaged in invidious discrimination.

## V.

Finally, nothing in the Metropolitan Transportation Authorities Act evidences any intent that SEPTA has priority over Philadelphia's interest in making SEPTA the subject of Philadelphia's Fair Practices Ordinance or the jurisdiction of the Philadelphia Commission on Human Relations. To the contrary, the General Assembly made it clear that local governments are authorized to enact local human relations ordinances to carry out the announced policy of the Commonwealth to root out invidious discrimination and to supplement its efforts which would have priority over the legislative grant to provide public transportation, a function that it assumed from private companies.

If we reach the second *Ogontz* prong that instructs us to glean legislative intent in a way that "would give effect to the legislative mandates of both governmental entities," *id.* at 455, the majority's finding that just knowing what those ordinances provide is so daunting and overwhelming and is not supportable. The consequence of making SEPTA subject to Philadelphia's Fair Practices Ordinance would mean that more invidious discrimination would be abated, while the trains, buses and trolleys would still run on time, or almost on time, not only a carrying out of the mandate of both agencies but also fostering the public good.

Accordingly, I respectfully dissent and would affirm the decision of the trial court.

_____
DAN PELLEGRINI, President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Southeastern Pennsylvania  :
Transportation Authority,   :
      Appellant  :
          :
    v.      :  No. 2445 C.D. 2009
          :  Argued: February 11, 2015
City of Philadelphia and   :
Philadelphia Commission on :
Human Relations    :


BEFORE: **HONORABLE DAN PELLEGRINI,** President Judge
     **HONORABLE BONNIE BRIGANCE LEADBETTER,** Judge
     **HONORABLE RENÉE COHN JUBELIRER,** Judge
     **HONORABLE ROBERT SIMPSON,** Judge
     **HONORABLE MARY HANNAH LEAVITT,** Judge
     **HONORABLE P. KEVIN BROBSON,** Judge
     **HONORABLE ANNE E. COVEY,** Judge


**DISSENTING OPINION**
**BY JUDGE SIMPSON**      **FILED: AUGUST 7, 2015**


I believe this case should be remanded to the Court of Common Pleas of Philadelphia County (trial court) for the receipt of evidence and initial fact-finding regarding the consequences of subjecting the Southeastern Pennsylvania Transportation Authority (SEPTA) to the City of Philadelphia's (City) anti-discrimination ordinance. Because I would vacate and remand, I respectfully dissent.

In this case, the trial court sustained preliminary objections. The pleadings are not closed, and no evidence has been adduced to resolve factual

issues raised by the preliminary objections. After subsequent appeals, our Supreme Court clarified the analysis which is to be undertaken in resolving the preliminary objections. That analysis includes a consideration of the consequences of subjecting SEPTA to the City's anti-discrimination ordinance. <u>See</u> <u>Se. Pa. Transp. Auth. v. City of Philadelphia</u>, 101 A.3d 79 (Pa. 2014).

Questions regarding the consequences cannot be resolved by an examination of the current complaint. <u>See</u> Reproduced Record at 96a. Therefore, I would afford the parties an opportunity to make a record on this issue, and I would allow the respected trial court to make initial factual determinations.

ROBERT SIMPSON, Judge